## CITY OF BROCKTON *vs.* INHABITANTS OF UXBRIDGE.

Plymouth.   Oct. 21, 1884. — Jan. 8, 1885.   C. ALLEN & COLBURN, JJ., absent.

In an action against the town of U. for supplies furnished to W., a pauper, who was alleged to have a settlement therein, under the Pub. Sts. c. 83, § 1, cl. 11, the record of naval enlistments prepared by a commission appointed under the U. S. St. of July 4, 1864, § 8, and the report of the Adjutant General of Massachusetts relating to the matter, were put in evidence. Upon this list appeared in print the name of W., the date and term of his enlistment, and the place of rendezvous, which was the name of a place in another State; and opposite his name was written the name of the defendant town. A clerk in the office of the Adjutant General testified that this meant that W. was apportioned to that town; and that "rendezvous" meant the place where the naval recruit enlisted. A rule established by the above-named commission, for the assignment to the quota, provided that only those were to be credited "who had joined the service at some rendezvous in this State." The record of enlistments above mentioned was prepared from the rolls of a receiving-ship for naval recruits at a port in this State. *Held*, that this evidence would justify a finding that W. was duly assigned as part of the quota of U.

In an action against a town for supplies furnished to a pauper, who was alleged to have a settlement therein, under the Pub. Sts. c. 83, § 1, cl. 11, by reason of service in the navy of the United States as part of the quota of that town, the names of the pauper and of a naval recruit, the dates of joining the service, of the arrival at the receiving-ship, and of the departure therefrom on duty, as they appeared on the records, and as testified to by the pauper, corresponded. *Held*, that this would justify a finding that the pauper and the recruit were the same person.

In an action against a town for supplies furnished to a pauper, who was alleged to have a settlement therein, under the Pub. Sts. c. 83, § 1, cl. 11, by reason of service in the navy of the United States as part of the quota of that town, the enlistment papers and muster roll, or authenticated copies of them, were not produced. · *Held*, that testimony of the pauper that he was enlisted, the facts that his name was found on the rolls of a ship of war, that he was transferred from there on duty, that he performed various services described by him, and that his discharge showed that he had served for more than a year, would justify a finding that he was duly enlisted and mustered into the naval service of the United States.

A discharge from the naval service of the United States is properly held to have been an honorable one, it not appearing to be otherwise.

A settlement may be acquired, under the Pub. Sts. c. 83, § 1, *cl.* 11, by reason of service in the navy of the United States as part of the quota of a town in this Commonwealth, although the person performing such service was, at the time of his enlistment, a resident of another town, notwithstanding the provision of the U. S. St. of July 4, 1864, § 8, that naval recruits are to be credited to the quota of the town "in which they respectively reside."

CONTRACT for supplies furnished by the plaintiff to James P. Williams, a pauper, in 1882. Trial in the Superior Court, without a jury, before *Barker,* J., who found for the plaintiff; and, at the defendant's request, reported the case for the determination of this court. The facts appear in the opinion.

*G. W. Hobbs & A. Lord,* for the defendant.

*H. Kingman,* for the plaintiff.

DEVENS, J. The plaintiff seeks to establish against the defendant town that James P. Williams, a pauper to whom necessary supplies were furnished by it, had acquired a settlement therein under that portion of the Pub. Sts. *c.* 83, § 1, *cl.* 11, which gives such settlement to any one who was duly assigned as a part of the quota of any town, after having been enlisted and mustered into the military or naval service of the United States during the late civil war, and who duly served for not less than one year.

Under the earlier requisitions for troops, there was no occasion to assign to counties, cities, towns, or other territorial subdivisions, the number which constituted their due proportion of men to be furnished for the suppression of the rebellion, as voluntary enlistment sufficiently supplied the wants of the military establishment. The U. S. St. of February 24, 1864, recognized the obligation resting upon them as existing from the beginning, and provided for ascertaining, under the name of its quota, the proportion which belonged to such territorial subdivision, the number of men who had rendered military service therefrom, and thus the number it was liable still to furnish when any draft should be made. *Bridgewater* v. *Plymouth,* 97 Mass. 382. By the U. S. St. of July 4, 1864, which was intended further to regulate and provide for the enrolling and calling out the national forces, it was provided, in § 8, as follows:

"That all persons in the naval service of the United States who have entered said service during the present rebellion, who have not been credited to the quota of any town, district, ward, or State, by reason of their being in said service and not enrolled prior to February twenty-fourth, eighteen hundred and sixty-four, shall be enrolled and credited to the quotas of the town, ward, district, or State, in which they respectively reside, upon satisfactory proof of their residence made to the Secretary of War."

Under this section, a commission was appointed by the Secretary of War to ascertain what credits the State of Massachusetts and its different subdivisions were entitled to, and the Acting Assistant Provost-Marshal General for Massachusetts was directed to carry into immediate effect all the credits allowed by the commission, unless especial reference to the Secretary of War was necessary.

The record of naval enlistments prepared by this commission, and the report of the Adjutant General of Massachusetts relating to this matter, which are public documents, were put in evidence without objection. Upon this list appeared the name of James P. Williams, which is that of the pauper, and against it was written the word "Uxbridge," which, without objection, a clerk from the office of the Adjutant General testified meant that he was apportioned to that town. It further appeared by the testimony of the same clerk that the word "rendezvous" under which was written the word "Portsmouth," meant the place where the naval recruit enlisted, referring to the alleged pauper. The clerk testified that the words "at N. Y. Oct. 9, '62," meant that a squad, of which Williams was one, was sent to New York on that day.

The defendant asked the presiding judge to rule, as matter of law, that, under the rule established by the commissioners for the assignment to the quota, as appears by the Adjutant General's report, Williams was not duly assigned to the town of Uxbridge; by which we understand that the defendant refers to the rule that only those were to be credited "who had joined the service at some rendezvous in the State."

The record of enlistments of the commissioners was prepared from the rolls of the ship Ohio, which was a receiving-ship for

naval recruits at Charlestown in this State.    The rendezvous at which Williams enlisted does appear thereby to have been Portsmouth, but this is not conclusive ; an accident may have occurred either in copying or recording, and the actual assignment of Williams by the commissioners tends to show that they declared and held him to have been a recruit who had enlisted at a rendezvous within this State.    What evidence there was before them there is no means now of ascertaining, but if the Williams described in this record or enlistment roll be the same person who received the relief as a pauper, his testimony given at the trial proves that he did join the service within this State.    The evidence given at the trial justified the presiding judge in finding that the recruit was the pauper.    The names, the dates of joining the service, of the time when the recruit arrived at the receiving-ship, and of the time when he was sent therefrom on duty, as they appear by the books, and as stated by the witness, correspond.

It is further contended that there was no evidence that the pauper was ever enlisted and mustered into the naval service of the United States, so that he could be assigned to the defendant town as a part of its quota, under the Pub. Sts. *c.* 83, § 1, *cl.* 11.    The enlistment papers and muster roll were not produced, nor were authenticated copies of them.    But the testimony of the pauper that he was enlisted, the facts that his name was found on the rolls of a ship of war as a recruit, that he was transferred from there on duty, that he performed various services described by him, and that his discharge shows that he had served for more than a year, furnished evidence upon which it might have been held that he was enlisted and mustered, as well as that he had served a year.

By the provisions of the statute, one who has left the service otherwise than by an honorable discharge does not acquire a settlement.    The discharge paper in this case simply states that James P. Williams " has this day been discharged from the U. S. Ship Lancaster, and from the naval service."    His discharge was properly held to have been an honorable one, it not appearing to be otherwise.

The defendant contends, that, as by the U. S. St. of July 4, 1864, § 8, naval recruits are to be credited to the quota of the

"town, ward, district, or State, in which they respectively reside," and as it appears by the uncontradicted evidence of the pauper that he resided in Bellingham at the time of his enlistment, he was never duly assigned to the quota of the town of Uxbridge. But, in view of the legislation on the subject of military settlements, this contention cannot be maintained. The St. of 1865, c. 230, conferred a settlement upon a soldier who had been enlisted and mustered as a part of a quota of a town, who was an inhabitant of that town, and had resided therein six months before his enlistment. The St. of 1868, c. 328, struck out the requirement that the soldier should have been a resident of the town for six months. The St. of 1870, c. 392, § 3, struck out the requirement that the soldier should have been an inhabitant of the town of whose quota he formed a part, and for which he enlisted. The St. of 1871, c. 379, substantially enacted the clause which we are considering as it stands in the Public Statutes. That these changes in the law might properly be made, even if the effect was to change from time to time the responsibilities of the towns in regard to military settlements, is not to be doubted. *Bridgewater* v. *Plymouth, ubi supra.* By ceasing to require that the soldier who formed a part of the quota should be an inhabitant of the town, but should be merely assigned to such town, it was contemplated that, if thus assigned, as the town would receive the benefit of his military service, in relieving it from the onerous duty imposed, equally whether he was or was not an inhabitant, it was just that there should be imposed upon it the burden of the military settlement. Whether it can be now shown that Williams was an inhabitant of Bellingham or not, he has been duly assigned to Uxbridge. The commissioners who were then authorized to decide the matter held him to belong and reside there, so assigned him, and that town has had the benefit of his services.

*Judgment for the plaintiff.*