### STATE v. FRANK C. WILLIAMS.

#### May Term, 1920.

Present: WATSON, C. J., POWERS, TAYLOR, MILES, and SLACK, JJ.

#### Opinion filed October 16, 1920.

*Criminal Law—Evidence—Commission of · Another Crime— "Wilfully" in G. L. 7104—Evidence of Former Neglect of Official Duty Admissible to Show Wilful Neglect Charged— Burden on Excepting Party to Show Prejudicial Error— Evidence of Other Offences Barred by Statute of Limitations Admissible to Show Wilful Neglect Charged—Harm-*

*less Error—Facts Shown by Other Testimony of Witness—
Question not Objectionable as to Form—Evidence Showing
Neglect of Duty—Question not Raised Below not Consid-
ered on Review—New Matter Excluded on Cross-examina-
tion—Admissibility of Memoranda—Parol Evidence as to
Data in Books—Exclusion of Irrelevant Part of Document
—Presumption that Officer Obtained Necessary Authority
to Act—Copies of Reports Authorized by Law Admissible
—Surplusage in Indictment May Be Rejected—Justified
Argument—Contradicting Evidence—Exception to Over-
ruling Motion for Verdict Waived by Proceeding with Trial
—Requirements of G. L. 568, 569—Exceptions to Argument
—Error not Shown by Record—Auditor's Vouchers Must
Be Kept in Office—Error in Charge Cured by Later In-
structions.*

1. In a criminal prosecution evidence of the commission of another
   crime by the respondent is admissible to prove motive, intent,
   or guilty knowledge, or where it is an incident to, or a part
   of, or leads up to, the crime with which the respondent is
   charged.

2. In G. L. 7104, providing that an officer who wilfully neglects the
   duties imposed upon him by law shall be imprisoned, etc., the
   word "wilfully" means intentionally and by design.

3. In a prosecution of the bank commissioner, under G. L. 7104, for
   wilfully neglecting to make an annual examination of the
   books and papers of the auditor of accounts, as provided by
   G. L. 568, and for wilfully neglecting to report the result of
   such examination to the General Assembly, as provided by
   G. L. 569, the books and papers in the auditor's office covering
   periods prior to the time alleged in the indictment, and while
   the respondent was in office, and testimony relating to trans-
   actions appearing therein were admissible on the question of
   respondent's knowledge of what appeared therein, and as tend-
   ing to show that his failure to report such information to the
   General Assembly was wilful.

4. The burden is upon the excepting party to show that alleged error
   was prejudicial.

5. Evidence of shortage in the auditor's account prior to three years
   previous to the finding of the indictment, and of respondent's
   failure to report the same to the General Assembly in the

years 1910-1914, was admissible to show respondent's knowledge of the status of the auditor's account in 1916, and that his failure to report the same to the General Assembly in 1917 was wilful, as against the objection that it showed offences barred by the statute of limitations.

6. The exclusion of cross-examination as to what certain vouchers showed was harmless, where the witness had already testified what they showed, and no one claimed the contrary.

7. A question to the deputy auditor of accounts on redirect examination as to whether he knew of his own knowledge that the total amount of orders drawn by the auditor to himself exceeded the total amount of salary, expenses, etc., for which he had returned, and could return, vouchers, was not objectionable as to form, nor as to substance as being immaterial.

8. Evidence that the orders drawn by the auditor and charged to his account during the time that the respondent was in office greatly exceeded the amount of the itemized vouchers furnished by him was admissible as tending to show that the respondent made no examination, or, if he did, that he did not report the true result thereof to the General Assembly.

9. An objection to the competency of a witness will not be considered on review, where the exception below was as to the materiality of the evidence.

10. New matter, not growing out of the direct examination of a witness, was properly excluded on cross-examination.

11. Where a previous answer on the cross-examination of a witness covered substantially the same ground covered by a subsequent question, there was no error in excluding the latter.

12. The exclusion of a question to the auditor's successor as to whether his predecessor, if he so desired, could have had vouchers for all the files, and later removed them, was harmless, it being apparent that his predecessor could have done what the expected answer would have shown.

13. A ground of objection, not raised at the trial, will not be considered on review.

14. The present auditor's answer to the question, which was the greater value in making up his books, the receipt, or the order by which the money was transferred from the State to the payee, that the receipt was the part of the record of his office showing the transaction, was a statement of a positive fact, and not of opinion.

15. Permitting the same witness to answer whether receipts were for anything more than the amount of money that certain orders represented, as against the objection that the receipts were the best evidence, was harmless; the receipts then being in evidence, and there being no dispute about what they were for or what they showed.

16. The reception of evidence that tended to favor, rather than to prejudice, the excepting party was harmless.

17. A summary of the auditor's account made by an expert accountant, and referred to by him when testifying, was properly admitted in evidence in connection with his testimony.

18. The same witness was properly permitted to indicate to the jury where certain material data relative to the auditor's account appeared in books received in evidence, since this neither added to nor took from what appeared in the account itself.

19. So much of a prior report made by the respondent to the General Assembly as had no bearing on the issues involved was properly excluded.

20. It will be presumed that the bank commissioner, in printing and publishing copies of his official report required by law, obtained the necessary statutory authority.

21. Printed copies of the official reports of the bank commissioner, being authorized by law, were admissible in evidence, as against the objection that the original reports were the best evidence.

22. Where the entire averment in an indictment is surplusage it may be rejected, and descriptive matter therein need not be proved.

23. The allegations in the indictment that the auditor of accounts obtained the money from the State treasury, which he had not accounted for, by the use of fraudulent and unlawful orders drawn upon the State treasury by himself, as such auditor, were surplusage, and it was not necessary for the State to prove that any particular order was fraudulent and unlawful.

24. The exclusion of evidence in the respondent's direct examination was harmless, when later in his examination he had the full benefit of the same.

25. An unresponsive answer by the respondent was properly stricken out.

26. The Attorney General's characterization of answers by the respondent as "argument" was not error, not being wholly unjustified.

27. The exclusion of the respondent's understanding of what it was necessary for him to do in the proper discharge of his duties in examining the books and papers of the auditor of accounts was harmless, where that matter had been fully covered by his previous testimony.

28. In contradiction of the respondent's testimony that, when he completed his examination of the auditor's books and papers on Septemeber 7, 1916, all of the orders drawn to the auditor prior to June 30, 1916, had itemized vouchers except to a certain amount which he considered not in excess of what would be required to pay the expenses of the office, and that in 1917, he made his official report of a correct balance on that basis, it was competent for the State to show that between said June 30th and September 7th the auditor had drawn other orders sufficient to pay such office expenses.

29. The reports of the auditor of accounts made by him to the General Assembly for the periods in question were properly excluded as immaterial, especially as they lacked the very information necessary to give the General Assembly knowledge of the true status of the auditor's account.

30. The respondent's exception to the overruling of his motion for a directed verdict at the close of the State's evidence was waived by proceeding with the trial.

31. The State's evidence tending to show that the books and papers in the auditor's office disclosed a large shortage in his account covering the entire time that the respondent was in office, which could have been readily discovered by an examination conducted with ordinary care and diligence, and that such condition was not reported to the General Assembly, made a case for the jury.

32. The examination of the books and papers of the auditor of accounts required of the bank commissioner by G. L. 568, is such as a person of ordinary intelligence and ability, holding such office, would make; and the report of the result of such examination to the General Assembly required by G. L. 569, is a full, true statement of the conditions disclosed by such an examination.

33, 37. The Supreme Court will not, even in criminal cases, consider questions not raised in the court below.

34. An exception to an argument will not be sustained where the

record does not show the argument to have been as the exceptant claims.

35. The law requires that vouchers given for orders drawn by the auditor of accounts shall be kept in his office.

36. There is no error where the question raised by an exception to a part of the court's charge is covered by later instructions.

INDICTMENT for violation of G. L. 7104. Plea, not guilty. Trial by jury at the September Term, 1918, Washington County, *Stanton*, J., presiding. Verdict, guilty. The respondent excepted. The opinion states the case.

*Frank Plumley* and *J. Ward Carver* for the respondent.

*Frank C. Archibald*, Attorney General, and *Earle R. Davis*, State's Attorney, for the State.

SLACK, J.   The indictment contains seven counts, each of which charges the respondent with a violation of G. L. 7104, which provides: "A state, county, town, village, fire district or school district officer who wilfully neglects to perform the duties imposed upon him by law, either express or implied, shall be imprisoned", etc., by wilfully neglecting to perform the duties imposed upon him as bank commissioner by G. L. 568, 569. The former section provides: "Said commissioner shall annually examine the books and papers of the auditor of accounts", and the latter provides: "Such commissioner shall biennially report to the General Assembly the result of his examination * * * of the books and papers of the auditor of accounts", etc.

The first count charges that the respondent wilfully neglected to examine the books and papers of the auditor of accounts for the fiscal year ending June 30, 1916; the second count charges that he wilfully neglected to report to the General Assembly of 1917 the result of his examination of the books and papers of the auditor of accounts for the biennial period ending June 30, 1916; the third charges that he wilfully neglected to report to the General Assembly, at its biennial session in 1917, the fact, then well known to him, that the auditor of accounts had withdrawn from the state treasury, contrary to law, by the use of fraudulent and unlawful orders drawn upon the State treasury, by himself, as such auditor, and payable to himself,

large sums of money, during each of the biennial periods ending June 30, 1910, 1912, 1914, and 1916, and unlawfully converted the same to his own use, which orders and sums were entered, and then and there appeared, upon the books and papers in the office of the auditor of accounts; the fourth count is like the third, in substance, except it covers only the biennial period ending June 30, 1916; the fifth is like the third, except it alleges that the orders so drawn and used by the auditor appeared upon the books and papers of the State treasurer *and* the books and papers of the auditor of accounts; the sixth is like the fourth, except it alleges that such orders appeared upon the books and accounts of the State treasurer *and* upon the books and papers of the auditor of accounts; the seventh need not be noticed because the respondent was discharged thereon at the close of the State's evidence.

Horace F. Graham was auditor of accounts from October, 1902, to January, 1917. The respondent was bank commissioner from January, 1909, to January, 1919. During the latter period the books and papers of the auditor of accounts which showed his transactions as such were a daybook and a loose-leaf distribution ledger, both books of original entry, the orders drawn by him upon the State treasury, department vouchers, so-called, and itemized vouchers. The department vouchers were personal receipts given by State officials for orders given them by the auditor, to cover expenditures thereafter to be made and services thereafter to be performed. Such officials were supposed to furnish the auditor, later, with itemized vouchers showing what the money had been actually used for.

The distribution ledger was made up from data contained in the vouchers, and showed the number of each order, its date, amount, to whom drawn, and for what purpose. The purpose was stated in a general way, when department vouchers were taken, but when itemized vouchers were furnished, whether at the time the order was drawn or later, the items were classified as salary, postage, telegrams, clerk hire, etc., and so entered in the ledger. The daybook contained the same information, except the classification of the items appearing in the vouchers.

Exceptions numbered 1, 2, 3, 4, 9, 10, 11, and 15, in the respondent's brief raise practically the same questions, and therefore are considered together. They relate to the admission in evidence of the books and papers in the office of the auditor of

accounts covering a period more than three years prior to the finding of the indictment, and to testimony relating to various transactions that appear in such books and papers during the same period. The respondent claims that this evidence was incompetent, because it only tended to show separate and distinct offences which were not covered by the indictment, and which' were barred by the statute of limitations. While it is an elementary principle of law, recognized by the cases cited by the respondent, that the commission of one crime is not admissible in evidence upon the trial of another, where its sole purpose is to show that the respondent has been guilty of other crimes, and would consequently be more liable to commit the offence charged, if the evidence is material to the issue, it is not inadmissible because it tends to establish the respondent's guilt of a crime other than the one charged. *State* v. *Sargood et al.,* 77 Vt. 80, 58 Atl. 971; Opinion of Parker, C. J. in *People* v. *Molineux,* 168 N. Y. 264, 62 L. R. A. 193, 61 N. E. at page 312, and cases there collected.

[1] There is a clear and important distinction between allowing evidence of the conviction of another crime to show motive, intent, or guilty knowledge, or where the crime proved is an incident to, a part of, or leads up to, the crime with which a respondent is charged, and a case where the crime proved is entirely independent of, and disconnected with, the crime charged. *State* v. *Donaluzzi,* 94 Vt. 142, 109 Atl. 57; *People* v. *McLaughlin,* 150 N. Y. 365, 44 N. E., at page 1023; *Weed* v. *People,* 56 N. Y. 628; *People* v. *Van Tassel,* 156 N. Y. 561, 51 N. E. 274; *People* v. *Place,* 157 N. Y. 584, 52 N. E. 576. In the former instance such evidence is admissible; in the latter it is not.

[2, 3] The neglect of the respondent in failing to examine the books and papers of the auditor of accounts, and to report the result of such examination to the General Assembly, to constitute an offence under the statute, must have been wilful, which has been said by this Court to mean, at least, intentional and by design. *State* v. *Palmer,* 94 Vt. 278, 110 Atl. 436; *State* v. *Muzzy,* 87 Vt. 267, 88 Atl. 895; *State* v. *Burlington Drug Co.,* 84 Vt. 243, 78 Atl. 882. The evidence under consideration, so far as it related to the time when the respondent was bank commissioner, was clearly admissible, both on the question of the respondent's knowledge of what appeared in the books and papers of the auditor, and as tending to show that his failure to report

such information to the General Assembly was wilful; that is, intentional and by design.   It is obvious that the longer such books and papers disclosed a shortage in the auditor's account the greater the probability that the respondent knew of such shortage, and the longer he knew of it and neglected to report it to the General Assembly, or failed to report it truthfully, the stronger the inference that his action in that respect was wilful.

[4]   So, too, the evidence of shortage in the auditor's accounts prior to the time the respondent became bank commissioner, at least, if such shortage continued down to 1916, as the State's evidence tended to show, was admissible on the question of intent or wilfulness, if the respondent had knowledge of it. Unless such knowledge appeared, this evidence was incompetent. It does not necessarily follow, however, that its admission is cause for reversal.   We think that even under the rule that formerly obtained in this State, its admission did not constitute reversible error.   *State* v. *Roby,* 83 Vt. 121, 74 Atl. 638; *State* v. *Bean,* 77 Vt. 384, 60 Atl. 807; *State* v. *Plant,* 67 Vt. 454, 32 Atl. 237, 48 A. S. R. 821; *State* v. *Turley,* 87 Vt. 163, 88 Atl. 562.   But under our present practice the burden is upon the excepting party to show that he has been prejudiced by the alleged error.   Sup. Ct. Rule 7; *Russ* v. *Good,* 92 Vt. 202, 102 Atl. 481; *Gilman Bros.* v. *Booth,* 91 Vt. 123, 99 Atl. 730; *State* v. *Pilver,* 91 Vt. 310, 100 Atl. 674; *Smith* v. *Martin,* 93 Vt. 111, 106 Atl. 666.   This the respondent has not done.   Other and competent evidence in the case is convincing, not only that there was a large shortage in the auditor's account at the close of the biennial period ending June 30, 1916, but that the respondent knew, or ought to have known, such fact, for a long time prior to that date, and that he did not report it to the General Assembly of 1917.   Indeed, this evidence is such that the jury could not fail to find these facts, and, further, to draw the inference that the respondent's neglect to report the same to the General Assembly was wilful.   The charge of the court, too, as to the use to be made of this evidence, and under what circumstances, could have left no doubt in the minds of the jurors concerning the matter.   It not being made to appear that the admission of this evidence was prejudicial, the exception is not sustained.

[5]   The respondent's claim that evidence of shortage in the auditor's account prior to three years previous to the finding

of the indictment, and of his failure to report to the General Assembly in 1910, 1912, and 1914, was inadmissible because of the statute of limitations is without merit. This evidence was not offered, or admitted, for the purpose of establishing an offence barred by the statute, but merely for the purpose, already indicated, of showing the respondent's knowledge of the status of the auditor's account in 1916, and that his neglect to report the same to the General Assembly in 1917 was wilful. For these purposes this evidence was admissible.

[6] On cross-examination of Mr. Joslyn, deputy auditor of accounts, and a witness called by the State, he was asked if the department vouchers, as a rule, did not show what the money, for which the order was given, was to be expended for, and to the exclusion of the answer the respondent excepted. If proper cross-examination, which is not decided, its exclusion was harmless, because the witness had already testified that such vouchers showed that the money was "on account of" or "on account of salary and expenses" or "on account of highway." This is all that they showed, and no one claimed otherwise.

[7] In redirect examination the same witness was asked whether he knew, of his own knowledge, that the total amount of orders drawn by Graham, to himself, exceeded the total amount of salary, office expenses, traveling expenses, and so forth, for which he had returned, and could return vouchers. The respondent objected to the form of this question, but this objection is untenable. He also objected to its substance for the reason that: "The charge is against this respondent that there were certain fradulent and unlawful orders drawn, of which this respondent had knowledge, of various amounts for certain years, that he failed to report to the Legislature, that is the crime charged here; and I don't think a question to this witness is material on that issue, if the court please." The witness answered, "I do". Subject to the same exception he testified, in substance, that the orders drawn by Graham and charged in his account, from 1910 to 1916, exceeded the amount of the itemized vouchers furnished by him by $12,003.37 not including orders for $1,200 and $1,800 shown by Exhibits C and D.

[8, 9] It was manifestly material to show that the books and papers which the respondent was required by law to examine disclosed conditions which could not have escaped the notice of an examiner of ordinary intelligence and ability, as tending to

show that no examination was, in fact, made by him, and also as tending to show that if he made one he did not report to the General Assembly, etc., the true result thereof. That the evidence did not point out any specific orders which were fraudulent or unlawful did not affect its admissibility; certainly not, under the first and second counts in the indictment. The respondent now argues that the witness did not know what the expenses of the auditor were, or what vouchers he could have filed, etc. But this argument goes to the competency of the witness, and not to the materiality of the evidence; a question not raised by the exception. *French* v. *Slack et ux.*, 89 Vt. 514, 96 Atl. 6; *St. Albans Granite Co.* v. *Elwell & Co.*, 88 Vt. 479, 92 Atl. 974. He further contends that the testimony was not limited as to time, and may have related to conditions that existed prior to the time the respondent took the office of bank commisioner; but the record shows that it related to the period from 1910 to 1916. We think that it was admissible.

[10] The same witness was asked in cross-examination: "Since you have been there in April, 1907, has it been the custom of that office, since that time, to make advances to State officials to pay their office expenses for the quarter?" This evidence was excluded subject to the respondent's exception. It does not appear that he then claimed that this was proper cross-examination. Indeed, the inference is that he did not, because in that connection he made the following offer: "Now I offer to show by this witness that the same mode of procedure and custom with respect to paying the bills of this office and in the other departments of the State had been followed from a time prior to the respondent entering upon the duties of bank commissioner * * * that has a fundamental bearing on the question in this case, as to whether the acts of the respondent, or the neglect charged, was a wilful and intentional neglect on his part."

Unless proper cross-examination, it was not error to exclude this evidence, at that time. The respondent now insists, however, that it was proper cross-examination; but the record fails to disclose anything, to justify this claim. It was clearly new matter, not growing out of the direct examination, and properly excluded.

[11, 12] Mr. Gates, the present auditor of accounts, testified in cross-examination how the books and papers in the

auditor's office were kept, and what appeared in them when he took the office; that he did not know what vouchers were presented by Graham to the respondent for the latter's examination, except what appeared from the books and papers that he found in the office. He was then asked: "Q. Well, would it be a difficult matter for your predecessor in office to change those vouchers if he had wanted to?" and answered: "Why, it could have been done, of course," He was then asked: "Could your predecessor in office, if he had desired, had a voucher for every one of those files here, and later removed them?" This was excluded, as a matter of discretion, subject to the respondent's exception. The previous answer of the witness covered substantially the same ground, so that in the exclusion of the latter answer the court was well within its discretionary powers. Moreover, it is perfectly apparent that the respondent's predecessor could have done precisely what the answer would have shown had it been what the respondent expected. No error appears in its exclusion. .

[13, 14] The same witness testified on cross-examination that the entries on the daybook and the distribution ledger were made from data appearing in the receipts. It is apparent from the transcript that the Attorney General thought that such entries were made from the orders, and thought that the witness had erred in his testimony, and in attempting to bring out the fact the following question was asked in re-direct examination: "Which was the greater value in making up your books, that receipt, or the order by which the money is transferred from the State to the payee, I want to know which is of the greater value —which is it, the receipt or order, by which the State is dispossessed of its money—in making up your accounts?" This was objected to on the grounds: "There doesn't seem to be any question about that * * * the order shows for itself * * * the witness has already said it was made up from the receipt," and subject to this objection the witness answered: "The receipt is the part of the record of the office showing the transaction." The only claim now urged against this evidence is that it was merely the opinion of the witness. This question was not raised in the court below, and for that reason might be dismissed without further comment. *Waterman* v. *Moody,* 92 Vt. 218, 103 Atl. 325; *Arnold* v. *Somers et al.,* 92 Vt. 512, 105 Atl. 260. The answer, however, clearly, was not in the nature of an opinion,

but was the statement of a positive fact. The exception is without merit.

[15] On redirect examination, the same witness was shown certain file wrappers, each containing what purported to be a department voucher, signed by Graham, and, after testifying that the different wrappers contained ''just a receipt,'' was asked: ''Were these receipts for anything more than the amount of money that the orders represented,'' and, subject to the respondent's exception that the receipts were the best evidence and showed what they were for, he answered, ''No''. If this answer was improper it was harmless, because the receipts were then in evidence, and there was no dispute about what they were for, or what they showed. *State* v. *Warner*, 91 Vt. 391, 101 Atl. 149.

[16] The same witness was further asked in redirect examination: ''From your examination of the auditor's accounts, from January, 1909, to June 30, 1916, did you find any entry that you saw, any indication about the books or about the papers, that indicated to you that the transaction had not been entered in the regular order in which it accrued,'' and answered: ''From my examination I found nothing of that kind.'' This evidence was harmless. It tended to support, rather than to prejudice, the defence. *Russ* v. *Good*, 92 Vt. 202, 102 Atl. 481; *Waterman* v. *Moody*, 92 Vt. 218, 103 Atl. 325.

[17] Mr. Pratt, an expert accountant called by the State, testified that he had examined the books and papers of the auditor of accounts, and had made a summary of the same from the distribution ledger for each fiscal year beginning with the year ending June 30, 1909, to and including the year ending June 30, 1916, of which Exhibit G was a typewritten copy. This summary showed the debit and credit side of the account; and the annual, or, in some instance, the biennial, balance. From this summary the witness testified, without objection, to the total debits, credits, and the balance for each year, or biennial period. Subject to the respondent's exception, such paper was then admitted in evidence in connection with the testimony of the witness, not as independent evidence. It was memoranda made by the witness from data found by him in the account of the auditor, at the time of his examination, and was used by him when testifying, to refresh his recollection as to the facts contained therein. For the purpose for which it was received,

it was admissible. *Taplin & Rowell* v. *Clark,* 89 Vt. 226, 95 Atl. 491; *Cheney* v. *Town of Ryegate,* 55 Vt. 499; *Williams, Admr.* v. *Wager et al.,* 64 Vt. 326, 24 Atl. 243; *Bates* v. *Sabin,* 64 Vt. 511, 24 Atl. 1013; *Stillwell* v. *Farewell,* 64 Vt. 286, 24 Atl. 243; *Lapham* v. *Kelly,* 35 Vt. 195. No objection was made to its admission because it was a copy of the summary made by the witness.

[18] The same witness testified that with Exhibits G and B to B18, inclusive, which were pages from the disbursement ledger, he could show the jury where on the latter exhibits the auditor's account for each fiscal year, opened and closed, the footings of the disbursement and voucher columns, and the annual balance made and carried forward, appeared; and, subject to the respondent's exception that the books were in the case and "show for themselves what they show," he was permitted to point out such places. This neither added to nor took from what appeared in the account itself. The witness was an expert accountant, familiar with this account, and he was merely allowed to indicate to the jury where certain data appearing therein was to be found. This was permissible.

[19] That part of a printed copy of the report made by the respondent to the General Assembly of 1910 that relates to the examination of the books and papers of the auditor of accounts was admitted, subject to the exception of the respondent that the report was made more than six years before the offence charged in the indictment is alleged to have been committed, and because the entire report was not admitted. The first question is disposed of by what was said concerning exceptions 1, 2, 3, etc. All of the report that had any bearing on the issue involved was admitted, and that was all that the respondent was entitled to.

[20, 21] A like copy of the report made by the respondent to the General Assembly in 1912, in 1914, and in 1917 was admitted in evidence, subject to the respondent's exception that the original reports were the best evidence. The respondent was required by law to make the originals of which these were copies. G. L. 569. When the copies of the report for 1910, 1912 and 1914 were made, they were not only authorized by law, but it was the duty of the respondent to make and publish them for *public distribution.* G. L. 570. The same was true as to the copies of the report for 1917, subject to the limitation im-

posed by No. 235, Acts 1915; and, such copies having been printed and published, the presumption is that the respondent complied with the provisions of such act by obtaining the necessary authority.  16 Cyc. 1076; Jones on Evidence, 214.

These copies were part of the Vermont Public Documents (G. L. 7488, 7507), and were required by law to be furnished to certain named officials and to the "members of the General Assembly during the session when such reports were made." G. L. 7511.  We think that they were admissible.  In *Watkins* v. *Holman*, 16 Peters 25, 10 L. ed. 873, it was held that a volume of state papers showing the report of certain commissioners under an act of Congress confirming the title in question, was admissible in evidence.  It was put on the same ground as journals of Congress and of state Legislatures, and reports sanctioned and published by authority.

As to the volume then in question, the Court said: "Now this original report, duly authenticated by the Treasury Department, to which it was made, would be evidence, and it is evidence in the published volume.  The very highest authenticity attaches to these state papers published under the sanction of Congress."  This case was cited and followed in *Fulham* v. *Howe*, 60 Vt. 351, 14 Atl. 652.  See, too, *Worcester* v. *Northborough*, 140 Mass. 397, 5 N. E. 270.

[22, 23]  At the close of the State's evidence the respondent moved that the State be compelled to elect and point out what orders it claimed to be fraudulent and unlawful as charged in counts three, four, five, and six of the indictment.  The motion was denied, and the respondent had an exception.

The offence charged in each of these counts is a wilful neglect to report to the General Assembly, in 1917, the fact, then known to the respondent, that the auditor of accounts had received a large amount of money from the State treasury, which he had not accounted for, as appeared from the books and papers in his office; or, in other words, a wilful neglect by the respondent to report to the General Assembly, in 1917, the result of his examination of the books and papers of the auditor of accounts.  The allegations as to how Graham obtained such money were not necessary to charge the offence for which the respondent is indicted, nor are they descriptive of it; therefore, it is immaterial that the orders mentioned in such counts are described as "fraudulent and unlawful".

While it is the general rule that when a person or thing, necessary to be mentioned in an indictment, is described with unnecessary particularity, all the circumstances of the description must be proved (*State* v. *Gilbert,* 13 Vt. 647; *State* v. *Freeman,* 15 Vt. 723; *State* v. *Newland,* 7 Iowa 242, 71 A. D. 444; *Commonwealth* v. *Garvin,* 121 Mass. 54, 23 A. R. 255; *Coffelt* v. *State,* 27 Tex. App. 608, 11 S. W. 639, 11 A. S. R. 205), it is equally well settled that, where the entire averment of which the descriptive matter is a part is surplusage, it may be rejected, and the descriptive averment need not be proved. *Brown* v. *State,* 72 Miss. 990, 18 South. 431; *Tyler* v. *State,* 69 Miss. 397, 11 South. 25; *State* v. *Flanders,* 118 Mo. 227, 23 S. W. 1086; *State* v. *Smith,* 32 Me. 369, 54 A. D. 578. "Surplusage," as defined by Bishop, "is any allegation without which the pleading would be adequate at law," from which the same eminent authority concludes that "in general, unnecessary averments in an indictment may be treated as mere waste material to pass unnoticed, having no legal effect whatever. They need not be proved, and all things go on as though they were not in the record." Bishop Crim. Proc. Vol. 1, § 478. Again, the same author says at section 479: "If an indictment is founded on a statute, and it contains allegations covering all the terms of the statute, and making a complete offence, and then if it adds something by way of making the offence appear more enormous, the latter matter may be disregarded as mere surplusage."

We think that the allegations respecting the orders, in these counts, were surplusage, and that it was not necessary to prove that any particular order was fraudulent and unlawful. The motion was properly denied.

[24]   The respondent testified, in his own behalf, that he was bank commissioner from January, 1909, to the time he testified, and was then asked, in substance, how many savings banks there were in the State at that time. The question being objected to, his counsel stated: "We are proposing to show, if the court please, the magnitude of his duties assigned to him by the same statute that places this—that is, by the same authority that places this duty upon him." The answer was excluded and the respondent had an exception. Its exclusion was harmless, because before he completed his direct examination he was permitted to testify fully concerning the various duties of his office, the number of banks and investment companies he had to

examine, how often he was required to examine each, his duties under the "blue sky law," and the large amount of work he had to do, and that he had no help. He thus had the full benefit of this evidence.

[25] He testified, later, that he made the first examination of the books and papers of the auditor in the fall or winter of 1910. He was then asked how much time he spent on that occasion. His answer was, in effect, that because of his other duties his examinations of such books and papers were piecemeal, extending over a period of time, and included other examinations. On motion of the State the answer was stricken out, and the respondent had an exception. The exception is without merit. The answer was not responsive; besides immediately following, the same question, in substance, was asked by the court and the respondent answered: "I can't tell now how much time, the first time I went there to begin an examination, for the reasons I have already stated."

[26] On three different occasions the Attorney General referred to portions of different answers given by the respondent as "argument."

The answers referred to show that this characterization was not wholly unjustified. The respondent cannot complain of remarks elicited by his own conduct. Under the circumstances error does not appear.

[27] The respondent testified, in direct examination, that prior to 1913 his examinations of the books and papers of the auditor of accounts were confined to the orders drawn, the daybook, and the department vouchers; that he did not examine the itemized vouchers, until the necessity for so doing was called to his attention by Mr. Joslyn in 1913. In that connection he was asked, and testified as follows: "Did you understand that it was part of your duty to observe in regard to itemized vouchers or—showing where the money had gone from the department which had received it, or the person who had received it? A. I did not attempt in my first years of examination to trace the expenditure of the money. Q. Why not? A. Well, I didn't understand it was necessary, and didn't appreciate that it was necessary; I took the view that when I found all of the orders drawn by the department had been properly entered and each order had in the files a receipt, or department voucher, showing that the person to whom it was drawn had the money,

had the order, and the purpose for which it was to be used; that that was sufficient. Q. How long did that state of understanding on your part continue, to what time? A. Well, I think sometime in 1913 Mr. Joslyn called my attention to the fact that the Governor or rather, the auditor at that time, had not filed all of his itemized vouchers for his orders,'' etc. Later, in his direct examination, he testified that he began searching for the itemized vouchers in the various departments about the time he talked with Joslyn, or soon after, and was then asked: ''Why didn't you do that before?'' and answered, ''Because I understood''— when he was interrupted by an objection, and the answer was excluded, subject to his exception. No offer of what the examination expected or desired to show was made; but his claim in argument was that the respondent's understanding of what it was necessary for him to do in the proper discharge of his duties was admissible on the question of wilful or intentional neglect. If admissible for this purpose, the precise ground, as we have seen, had been fully covered, so that the exclusion of this answer could not have harmed the respondent.

[28] The State was permitted to show by the respondent in cross-examination, that, between June 30, 1916, and September 7 following, the auditor drew orders payable to himself, and upon which he obtained money, aggregating $2,900. This evidence was received subject to the respondent's exception that these transactions being subsequent to June 30, 1916, it was immaterial.

He had testified in direct examination that when he completed his examination September 7 all of the orders drawn to the auditor prior to June 30, 1916, as he understood it, had itemized vouchers, except $2,659.93 ''that he (the auditor) had drawn for the expenses of the office for the following months''; that he knew, substantially, what the expenses of the auditor's office were, and believed that the amount in the hands of the auditor, unvouched for, was not in excess of what would be required to pay such expenses, and made his report to the General Assembly, in 1917, on that basis. The material part of such report was: ''I have checked up the vouchers in the auditor's office, and proved the trial balance for each year, and found them correct.'' We think that in view of his direct examination it was competent for the State to show that at the time he completed his examination the auditor had drawn other

orders, subsequent to June 30, sufficient to pay his office expenses "for the following months," as bearing upon the probability of the reason given by the respondent for not reporting the amount in the auditor's hands unvouched for June 30, 1916. To be sure, the respondent testified that he did not know about these subsequent orders, but he had placed himself in a position where it was his duty to know about them. The exception is without merit.

The witness Pratt was recalled, after the above occurred, and, subject to like exception, was permitted to testify that the books in the auditor's office showed that Graham drew to himself three orders in July, three in August, and one in September, 1916, before the date when the respondent completed his examination, aggregating $2,900. This evidence was admissible for the reasons above stated.

[29] The respondent offered in evidence the reports made by the auditor of accounts to the General Assembly in 1910, 1912, 1914, and 1917, to show that the auditor therein reported every order drawn, to whom, what for, and the advancement made and what for, to repel the claim that the respondent was dishonest in the performance of his duties, in trying to deceive the General Assembly, and to corroborate the testimony of the respondent that Graham advanced money to certain State officers. They were excluded, and the respondent had an exception. They were not admissible. That the auditor reported to the General Assembly the facts claimed did not absolve the respondent from the performance of his duty, or have any legal bearing on the question of whether he did or did not perform it. Besides, these reports lacked the very information necessary to give the General Assembly knowledge of the true status of Graham's account, namely, the itemized vouchers furnished by him.

That the auditor, in those reports, characterized the money furnished to the heads of different departments as "advancements" was immaterial. There was no question, so far as the evidence was concerned, about what was done in that respect, and it was of no consequence what any one called it.

The testimony of the respondent, which it was claimed this evidence tended to corroborate, was undisputed, and was so treated by the court in its charge, as will appear later.

At the close of the State's evidence, the respondent moved that he be discharged on the first count, because the evidence

introduced on the part of the State showed that he did make an examination of the books and papers of the auditor of accounts for the fiscal year ending June 30, 1916, and that in respect to that count no part of the State's case had been made out; that he be discharged on the second count, because the State had offered proof to show, and had shown, that he did make a report to the General Assembly of 1917; that he be discharged on the third, fourth, fifth, and sixth counts, because the State had introduced no evidence upon which he could be convicted under those counts, and that no sums had been stated as to what the certain unlawful orders were, or that they came to his knowledge, or that his failure to report to the General Assembly was wilful; and that he be discharged on the seventh count, for reasons not necessary to state, because as to this account the motion was granted.

[30]    The motion as to the other counts was overruled, and the respondent had an exception. He waived this exception by proceeding with the trial. *Hobbs & Son* v. *Grand Trunk Ry. Co.*, 93 Vt. 392, 108 Atl. 199; *Latremouille* v. *Bennington & Rutland Ry. Co.*, 63 Vt. 336, 22 Atl. 656.

[31]    The motion was renewed, however, at the close of all of the evidence, so its merits are for consideration. We hold that it was properly denied. The State's evidence tended to show, either that the respondent did not make an examination, as charged in the first count, or, that he did not report the result thereof to the General Assembly, as charged in the second and subsequent counts.

While there was evidence tending to show that he did make an examination in 1916, the State's evidence tended to show that the books and papers in the office of the auditor disclosed a large shortage in the account of that officer, extending over the entire time that the respondent was bank commissioner, which could have been readily discovered by an examination conducted with ordinary care and diligence, and that such condition was not reported by the respondent to the General Assembly of 1917. This clearly made a case for the jury on the question of whether an examination was in fact made, at least, such an examination as the statute requires.

It is true, as claimed by the respondent, that some of the State's evidence tended to show that he made a report to the General Assembly in 1917. But something more was required

of him than that he make a report; he was required to make a correct report of the conditions disclosed by his examination, and the State's evidence tended to show that if he in fact made an examination he did not make a correct report of the result thereof to the General Assembly of 1917.

[32, 33]    The examination which this statute requires is such as a person of ordinary intelligence and ability, holding the position which the respondent held, would make; and the report which the statute requires is a full, true statement of the conditions disclosed by such an examination.    No less an examination is an examination, and no other report is a report, in the eye of the law.    It is now urged that the respondent should have been discharged on one or the other of these counts because they are contradictory; but this question was not raised below, and therefore will not be considered here.    *State* v. *Monte,* 90 Vt. 566, 99 Atl. 264, and cases cited.

The evidence tending to establish the material allegations in the remaining counts is too voluminous to permit a reference to any considerable part of it.    According to the testimony of the respondent he learned, soon after his talk with Joslyn, in 1913, the condition of Graham's account down to that time, and knew its condition thereafter down to June 30, 1916.    Pratt, the expert accountant, testified that June 30, 1913, Graham had in his hands, unvouched for, according to the books and files in his office, $12,291.58, and that this amount was increased to $14,042.33, June 30, 1916.    It further appeared that the respondent did not make any report to the General Assembly of 1914, the session following his examination in 1913, and that in 1917, he made the report above quoted.    We think these circumstances, alone, sufficient to meet the question raised by the motion, except the one that no particular order was shown to be fraudulent, or that the respondent was shown to have knowledge of such order, which we have seen was not necessary, and clearly made a case for the jury.

[34]    The respondent excepted to the argument of the Attorney General, claiming that he was arguing that the respondent failed to do his duty by reason of the fact that he might receive an appointment.    The Attorney General denied that he made such a statement, and said: "I said it doesn't appear in evidence that Mr. Williams was appointed bank commissioner in June, 1916; that he was not in January, 1917; that he was not

until April 4, 1917, and I pick that material from the record, or from the exhibit that has been offered here in the case." This is the substance of all that appears in the record on this subject. If the argument of the Attorney General was as claimed by the respondent, the record does not show it, hence error does not appear.

[35, 36]     The court charged the jury: "It is the law of this State, gentlemen, that these vouchers should be kept in the office of the auditor—it was the law at that time." This was excepted to by the respondent, he claiming that it would not be unlawful for the auditor, in the administration of his duties, to have some of the vouchers at some other place than the particular files, in the prosecution of his work. The court stated the law correctly. G. L. 578; *Clement* v. *Graham,* 78 Vt. at p. 307, 63 Atl. 150, Ann. Cas. 1913 E, 1208. The court further said, however: "You will remember that this matter of how the things came in there, the officers, heads of departments, including the auditor himself, had orders drawn in their official capacity, giving what has been called 'department vouchers' * * * later he furnished itemized vouchers for the money; and the evidence discloses on the part of the respondent at least, that that might run over a considerable period of time, and did, before these itemized vouchers were filed in the office, and so you consider that, gentlemen, as bearing upon the question of the fidelity with which this respondent operated and worked in the discharge of his duties in reference to the auditor's office." This covers the point raised by this exception, and is all that the respondent was entitled to.

[37]     The respondent now claims that it was the duty of the court, in its charge, to limit the use of the evidence received under exceptions 1, 2, 3, etc., to the purpose for which it was received, namely, to show motive, intent, and knowledge, although he admits that the court was not requested to so charge, and that no exception was taken to the charge as given because of its failure in that respect.

It is the established rule of this Court that it will not, even in criminal cases, consider questions not raised in the court below. *State* v. *Monte, supra.*

*Judgment that there is no error in the proceedings, and that the respondent take nothing by his exceptions. Let execution be done.*